# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **STEVEN BERNARD SYDOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:16-cv-1972** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **DARREN SETTLES, Acting Warden,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. The petitioner is serving an effective sentence of 25 years imprisonment, imposed by the Davidson County Criminal Court on July 19, 2007, after a jury convicted the petitioner of second-degree murder and theft of property over $1,000 but less than $10,000. The respondent has filed an answer to the petition (ECF No. 15) stating that the grounds should be denied because they are not cognizable in federal habeas proceedings, are without merit, and are procedurally barred.

The matter is ripe for review and the court has jurisdiction. 28 U.S.C. § 2241(d). The respondent does not dispute that the petitioner's federal habeas petition is timely. (ECF No. 15 at Page ID# 2546.) The respondent states that the federal habeas petition at issue here appears to be the petitioner's first application for federal habeas relief. (*Id.*)

Because a federal court must presume the correctness of a state court's factual findings unless the petitioner rebuts this presumption with 'clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and because the issues presented can be resolved with reference to the state-court

record, the court finds that an evidentiary hearing is not necessary. *See Schriro v. Landrigan*, 550 U.S. 464, 474 (2007) (holding that, if the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing (citing *Totten v. Merkle,* 137 F.3d 1172, 1176 (9th Cir. 1998))). Upon review and applying the AEDPA standards, the court finds that the petitioner is not entitled to relief on the grounds asserted. Accordingly, the petition will be denied and this matter, dismissed.

## I.    PROCEDURAL BACKGROUND

The state prosecution arose from the death of April Anderson, the victim, who was the petitioner's live-in girlfriend at the time of her death, and the theft of the victim's car. On March 3, 2006, the petitioner was indicted by the Davidson County grand jury and charged with one count of first-degree murder and one count of theft of property valued at more than $10,000 but less than $60,000. (ECF No. 14-1 at Page ID ## 58-60.) The petitioner was tried before a jury, beginning on May 21, 2007 and concluding on May 24, 2007. (ECF Nos. 14-8 through 14-12.) At the conclusion of trial, the jury found the petitioner guilty of second-degree murder and theft of property in the amount of $1,000 or more, but less than $10,000. (ECF No. 14-12 at Page ID # 1025.) Following a sentencing hearing on July 19, 2007, the trial court sentenced the petitioner to 25 years for the second-degree murder conviction and 4 years for the theft conviction to run concurrently for a total effective sentence of 25 years imprisonment to be served at 100%. (ECF No. 14-15 at Page ID# 1294.)

The petitioner appealed his judgment of conviction to the Tennessee Court of Criminal Appeals ("TCCA"), which rejected all appellate arguments and affirmed the petitioner's convictions and sentences in an unpublished opinion issued on February 2, 2010. (ECF No. 14-20 at Page ID## 1564-1582; *see also State v. Steven Bernard Sydnor*, No. M2007-02393-CCA-

R3-CD; 2010 WL 366670, at *1 (Tenn. Crim. App. Feb. 2, 2010) [*Sydnor I*].)[1]  The petitioner

filed an application for permission to appeal to the Tennessee Supreme Court ("TSC"), which

was denied on June 17, 2010.  (*Id.*)

On November 18, 2010, the petitioner filed a petition for post-conviction relief in the

Davidson County Criminal Court.  (ECF No. 14-24 at Page ID## 1684-1733.)  On February 11,

2011, the trial court appointed counsel to assist the petitioner.  (ECF No. 14-24 at Page ID#

1745.)  On April 7, 2011, counsel filed an amended petition for post-conviction relief in the state

court (ECF No. 14-24 at Page ID## 1746-61), and, on July 29, 2011, counsel filed a second

amended petition (ECF No. 14-25 at Page ID## 1814-31).  The matter was heard on August 21,

2011 and January 11, 2012, at which time it was denied.  (ECF No. 14-25 at Page ID## 1882-

83.)  The trial court issued a memorandum opinion denying relief on March 10, 2015.  (ECF No.

14-25 at Page ID## 1887-1903.)

The petitioner appealed to the TCCA, which denied relief on January 26, 2016.  (ECF

No. 14-33 at Page ID## 2538-42; *see also State v. Steven Bernard Sydnor,* No. M2015-00651-

CCA-R3-PC, 2016 WL 304415, at *1 (Tenn. Crim. App. Jan. 26, 2016) [*Sydnor II*].)  The

petitioner filed an application for permission to appeal to the TSC, which was denied on June 23,

2016.  (*Id.*)

## II.    STATEMENT OF FACTS

The TCCA summarized the facts presented at trial as follows:

The State's first witness at trial was Savannah Singer, one of the victim's five
sisters.  Singer testified that in November 2004, the victim and the appellant lived
near them in Culver City, California.  The relationship between the victim and the

---

[1] In the instant habeas petition, the petitioner's name is spelled "Sydor."  On appeal in the state
court, the petitioner's last name was spelled "Sydnor."  The court refers to the petitioner by the
name he uses in his habeas petition.

appellant was tumultuous, and the victim's family urged her to move to Tennessee to get away from him and be near other family members.

Singer stated that in January 2005, the victim was staying with friends, not with the appellant, after spending a week visiting family in Montana. Singer said the victim gave her the code to access the voice mail on the victim's cellular telephone. Three of the voice mail messages Singer heard were from the appellant; two were messages for the victim and the other was for the victim's youngest son. In one message to the victim, the appellant told her that he knew she was back in town and that she should return his call. In the second message to the victim, the appellant said that he knew where the victim and her children were living. In the message to the victim's youngest son, the appellant said that he knew where the child went to school. Singer stated that all three messages were "sinister" and "threatening" in tone.

Singer said that because of the messages, she helped the victim get out of town. The victim moved to Tennessee and began living intermittently with her sisters, Holly Anderson and Tina Anderson. In October 2005, the victim began living with the appellant, who had also moved to Tennessee.

Singer testified that she last talked with the victim one week prior to her death. The victim mentioned that she was sad because of the death of their grandparents in October and that she was looking forward to being with family at the grandparents' memorial service, which was scheduled to be held in Pennsylvania on November 26, 2005. The victim planned to drive her car to Pennsylvania after Thanksgiving dinner on November 24, 2005, and several family members were scheduled to ride with her. Singer said that the appellant had not been invited to the memorial service.

Hillary Selvin, the partner of the victim's sister, Bonnie Anderson, testified that she first met the appellant one morning in February 2005. Selvin saw the victim and the appellant sitting in the victim's Honda Accord which was parked in the driveway of the home Selvin and Bonnie shared. The appellant and the victim were arguing, and the appellant would not get out of the victim's car. Shortly thereafter, the victim left to take the appellant to a bus station. The victim returned fifteen minutes later, visibly upset, crying, scared, and anxious. Selvin and Bonnie spoke with the victim for hours, suggesting places where she could get help dealing with "whatever issues she was dealing with." Selvin said they also urged the victim to get out of town and go to Montana to stay with her mother and brother. The victim left for Montana about twenty-four hours later, putting her belongings in storage while she was away. When the victim returned to California approximately one week later, she gave away the items that had been in storage, preparing to move to Tennessee to stay with one of her sisters, Holly or Tina, who were living near Nashville.

Selvin testified that after the victim returned from Montana but before she left California for Tennessee, Selvin listened to the victim's voice mail messages and heard three messages from the appellant. Selvin said:

> [T]here were a couple of messages, one in which [the appellant] said, "I know you dropped off the microwave at my sister's house, I know you're back in town," and "I know you're back in town and, you know, I know where your girls live. I know where you are and I'm going to take care of you."

Selvin also heard a message the appellant left for the victim's youngest son, wherein the appellant said, "I know where you go to school . . . . I know your school route and I know where you live, and I know . . . what school you go to and I know how to get to you." Selvin said all of the messages were "very threatening." Selvin said that the victim moved to Nashville in March or April 2005, first staying with her sister Holly then with her sister Tina.

Officer Shane Fairbanks of the Metropolitan Nashville Police Department testified that on November 22, 2005, he was driving down Sylvan Street toward South Seventh Street when he saw the appellant walking down South Seventh Street. When the appellant saw Officer Fairbanks, he walked toward the officer with his hands in the air as if he were surrendering. Officer Fairbanks radioed dispatch that he was stopping, and he requested backup. After Officer Fairbanks stepped out of his car, the appellant continued to approach with his hands in the air.

The appellant told Officer Fairbanks that he wanted to turn himself in. Officer Fairbanks asked the appellant what was going on and why he wanted to turn himself in. The appellant, who was distraught and emotional, did not answer right away. Officer Fairbanks asked the appellant if he had done something, and the appellant replied that he "took it too far." The appellant said that he and his girlfriend, the victim, often argued. The appellant maintained that when they argued, the victim "played like" she would commit suicide. The appellant said that a day and a half earlier, he and the victim argued. The appellant said that she "got a knife and told him that she wanted him to do it . . . . [H]e put his hands on the knife and they put the knife to her throat and they cut her throat together." Officer Fairbanks asked if the appellant thought the victim was dead, and the appellant responded affirmatively.

Officer Fairbanks said:

> [T]o be honest, I really wasn't sure if he was telling me the truth or not because no one's ever come up and told me that before, anything like that, but at the same time, you know, I wanted to make sure, I had to find out if it was true or not, so that's why I had dispatch[ ] send cars over to the address

to check and see if anyone's there, and if so, if they're okay. Also, at the same time, at some point during my time with him, I did call Mobile Crisis, which, whenever we have somebody that's either suicidal or homicidal, like if somebody calls and says, "Hey, I'm going to take a bunch of pills," you know, if they're a danger to themselves or someone else, we'll call Mobile Crisis, and basically they're kind of an intervention and those people can get them help. So, based on what the [appellant] was telling me, I went ahead and called them just to see if they were familiar with him, if it's you know, something that he's gone through before or not, and they had never dealt with him.

Officer Fairbanks said that Officer Spain arrived as backup, and Officer Fairbanks continued to talk with the appellant:

Basically, I mean, we were just standing there having a conversation, you know, he's telling us things and we're trying to find out as much as we can to make sure nobody is in danger, you know, and also to try to verify or see if what we were being told is the truth.

Officer Fairbanks said that the appellant gave him the victim's name, telephone number, and address. Officer Fairbanks called dispatch and requested that officers proceed to the victim's address, apartment C–19 at the Brookwood Apartments in Madison, to investigate the appellant's allegations. The appellant told Officer Fairbanks that after the incident, he left the victim's apartment in the victim's car and that while he was driving on the freeway, he threw away the knife he had used on the victim. The appellant said that he parked the victim's car in a nearby alley, locked it, and threw the keys in the alley.

Officer Fairbanks said that the appellant asked to sit down, and he offered to let the appellant sit in the back of the patrol car. Officer Fairbanks handcuffed the appellant and placed him in the patrol car. Officer Fairbanks then drove to an alley off of South Seventh Street and Boscobel where the victim's car was located. Police could not find the keys to the car. While he was in the alley, Officer Fairbanks received a call from police dispatch informing him that the victim's body had been found at the address provided by the appellant.

Metro Officer Archie Spain testified that on November 22, 2005, he heard a radio report that Officer Fairbanks was with a suspect at Seventh Street and Sylvan. Officer Spain said the location was a "high crime area," so he went to the scene as backup. When he arrived, he saw Officer Fairbanks speaking with a black male, the appellant. The appellant said that two or three days earlier, he had accidentally killed his girlfriend with a knife, which he threw out on the interstate. The appellant said he had taken the victim's car, driven around for a while, parked her car in a nearby alley, and thrown the keys away. Officer Spain said the appellant was "crying like a baby" while he was talking with the officers. Officer

Spain stated that he wondered if the appellant were telling the truth or if he were crazy. Officer Spain said the appellant gave accurate directions to where he had parked the victim's Honda in a nearby alley.

Metro Detective Matthew Filter testified that on November 22, 2005, he and Detective Terrence Bradley heard Officer Fairbanks radio for assistance from a detective. When Detective Filter arrived at the scene, he saw Officer Fairbanks and the appellant standing outside the patrol car. Officer Fairbanks told Detective Filter what the appellant had been saying. During their conversation, the appellant walked up and told Detective Filter that about a day and a half earlier, he and his girlfriend got into an argument. The appellant said that when they argued, the victim acted as if she were going to commit suicide. The appellant stated that on this occasion, the victim took a knife and put it to her throat. The appellant attempted to take the knife from her, and "they cut her throat together." The appellant told Detective Filter that he thought the victim was dead, so he took the knife, got into the victim's car, and fled. The appellant said that he drove around on the interstate, tossed the knife, and later abandoned the car. Detective Filter said police found the victim's car in a nearby alley. Detective Filter said the appellant was very excited and anxious and seemed as if he wanted to talk. Detective Filter said his conversation with the appellant lasted two or three minutes.

Detective James Fuqua of the Metropolitan Police Department testified that he was one of the officers who responded to the victim's apartment at 714 Due West Avenue. Detective Fuqua saw the victim's body on a blanket in the back bedroom of the apartment. Her wrists were bound behind her back with a riveted black leather belt, her ankles were bound together with another black leather belt, and a black coaxial cable looped between the hand and foot bindings, drawing her limbs together behind her back in a "hog-tie" fashion. A shirt was wrapped around her face, and a cord from a cellular telephone charger protruded from under the shirt. Detective Fuqua saw "saturation blood on the neck area and on the shoulder, around the left eye area and around the throat area." Blood was also on the carpet around the victim.

Detective Fuqua said that there was no furniture in the bedroom, only luggage and baggage containing clothing. Mattresses were on the floor in the living room. Men's and women's clothing was scattered around the apartment, and the appellant's business cards were on a counter.

Detective Fuqua left the victim's apartment and went to the north precinct to talk with the appellant. Upon request from Detective Fuqua, the appellant signed a form, consenting to a search of the apartment he shared with the victim.

Detective Fuqua said that police were unable to get fingernail scrapings from the appellant because his fingernails were chewed too short. However, Detective

Fuqua noticed that the appellant "had some injuries to his hands, some cuts . . . like a knife cut."

Two box cutters and a pair of scissors were found in the victim's car, but there was no blood on the items. Crime scene officers said that there was damage on the car from the middle of the front door to the back tire, as if the car had sideswiped something or had been sideswiped. Also in the car were papers bearing both the victim's name and the appellant's name, and a man's tie was in the backseat. However, there was no blood in the victim's car.

Dr. Amy R. McMaster, the medical examiner who performed the autopsy of the victim, testified that the thirty-nine-year-old victim was 5'1" tall and weighed 100 pounds. Dr. McMaster said that the victim was wearing a beige sweater with a green shirt underneath, blue jeans, and black boots. A pink or peach shirt was wrapped around her upper neck and lower mouth. Beneath the shirt, a black electrical cord was wrapped around her mouth and neck, securing a white sock which was stuffed in the victim's mouth. Dr. McMaster said that the victim's wrists were bound so tightly with the riveted black leather belt that blood was pushed to either side of the ligature and circular rust stains were left embedded in her skin. Dr. McMaster stated that the victim's body was showing signs of decomposition at the time of the autopsy.

Dr. McMaster said that the black cord around the victim's neck was tied tightly enough to constrict the airway. Additionally, the victim had a number of cuts to her throat; the cuts extended to the tissue beneath the skin but were not deep enough to damage any of the major blood vessels in the neck. Dr. McMaster said that if the victim were still alive when the cuts were made, the cuts would have bled a "great deal." Dr. McMaster stated that there was not much blood at the scene. She opined that

> the explanation for the fact that there wasn't more blood is one of two
> things; either she died shortly after those cuts were inflicted on her neck,
> and also because of the pink shirt wrapped tightly around her neck was
> pressure and it helped to stop the bleeding, so it could be a combination of
> those two things or one or the other independently.

Dr. McMaster said that the cause of the victim's death was a lack of oxygen, otherwise known as asphyxiation. Dr. McMaster opined that the gag in the victim's mouth made it difficult for her to get air. She explained that the shirt and cable wrapped around her neck impeded her ability to get oxygen and that the bleeding from the cuts on her neck contributed to the lack of oxygen. Dr. McMaster said that estimating the length of time before death was difficult because she did not know if the injuries contributing to the victim's death occurred at one time. However, Dr. McMaster said that a complete lack of oxygen would generally render a person unconscious in thirty seconds and would

cause irreversible brain damage or death within a few minutes. Dr. McMaster estimated that the victim had been dead at least twenty-four hours prior to autopsy. Tests revealed that no drugs or alcohol were in the victim's body when she died.

Agent Charles Hardy, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that the appellant's blood was found on his gray sweatshirt and in several spots on his blue jeans. The victim's blood was on the tongue end of the belt that was wrapped around her wrists, and DNA which did not match the victim or the appellant was on the belt buckle. There was "visible staining" on the buckle, waistband, and "middle back" of the belt that was around the victim's ankles. The blood on that belt was a mixture; the major contributor was the appellant and the minor contributor was the victim. Agent Hardy saw "questionable indentations on the tongue of the belt," which could have been from a person's teeth. Testing revealed the appellant's saliva on the tongue of the belt around the indentations. The cord around the victim's neck, an AC adaptor, was stained with the victim's blood. The appellant's DNA was on the coaxial cable which connected the victim's bound wrists and ankles.

Agent Hardy said that the appellant's sperm was found on swabs taken from the victim's vaginal and anal area. DNA consistent with the appellant was found on clippings taken of the fingernails of the victim's left hand. Blood from both the appellant and the victim was found on the beige sweater the victim was wearing. The victim's DNA was found on the pink shirt that was wrapped around her head; a second contributor's DNA was also found on the pink shirt and the appellant could not be excluded as the minor contributor. The victim's blood was also found on the toe area of the sock which was in her mouth.

The victim's sister, Holly Anderson, testified that she lived in White House, Tennessee, and that the victim moved in with her in March 2005. In mid-September 2005, the victim went to live with another sister, Tina Anderson. In October 2005, after the appellant came to Tennessee, the victim moved into an apartment with the appellant. Holly Anderson said that on November 26, 2005, the family was scheduled to leave for Pennsylvania to attend a memorial service for their recently deceased grandparents. The victim was one of the people slated to drive.

Holly Anderson said that she went to the victim's apartment after her death to gather some of the victim's belongings. Later, she went through the papers she had gathered from the kitchen counter and found a note which was signed by the appellant. The note said, "Mom, I have done it. I used today. Last night I was kind of fiending and I did it today, 11/20."

Detective Fuqua testified that Holly Anderson gave him the note after she found it. He said that "fiending . . . has something to do with drug usage, possibly wanting drugs . . . needing or wanting drugs."

Singer and Selvin both testified that in April 2004 the victim bought a new, silver Honda Accord for her birthday. Selvin said that the victim paid "[o]ver $500 a month on the car."

*Sydnor*, 2010 WL 366670, at *1–6.

## III.   ISSUES PRESENTED FOR REVIEW

In his *pro se* petition, the petitioner raises the following grounds for relief:

A.  The trial court erred in denying a motion to suppress the statements the petitioner made to the police;

B.  The trial court erred in admitting:

1.  A photograph of the victim taken prior to her death;
2.  Graphic photographs of the victim's face and body (post-mortem)
3.  Testimony regarding alleged incidents of threatening conduct;

C.  The trial court erred in imposing the maximum sentence on the petitioner's conviction for second-degree murder;

D.  The evidence was insufficient to support the petitioner's convictions.

(ECF No. 1 Page ID## 5-25.)

## IV.   STANDARD OF REVIEW

This matter is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir.

2006). "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009). AEDPA prevents federal habeas "retrials" and "ensure[s] that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, this court may not rely on the decisions of lower federal courts. *Lopez v, Smith*, 135 S. Ct.1, 4 (2014); *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644-45 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see Burt v. Titlow*, 134 S. Ct. 10, 16 (2013); *Metrish v.*

*Lancaster*, 133 S. Ct. 1781, 1786 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Indeed. "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).

> Under AEDPA, 28 U.S.C. § 2254(d):
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Davis v. Ayala*, 135 S. Ct. at 2198; *see also White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.') (internal citation omitted).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court cases, or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). The court may grant relief under the "unreasonable application" clause "if the state court

correctly identifies the governing legal principle from United States Supreme Court decisions but unreasonably applies it to the facts of the particular case. *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

## V.    DISCUSSION

### A.    Procedurally Defaulted Claims

The petitioner argues that the trial court violated his constitutional rights when it admitted a photograph of the victim while she was alive and testimony regarding the petitioner's prior threatening conduct.    Additionally, the petitioner argues that the trial court violated his constitutional rights by sentencing him based on facts that the trial court, and not the jury, found to be true in violation of *Blakely* and *Cunningham*.[2]  The respondent argues that these claims are procedurally defaulted because they were not raised as federal constitutional claims in the state court.

---

[2] *Blakely v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007).

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon the petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971). To fulfill the exhaustion requirement, the petitioner must have fairly presented his federal claims to all levels of the state appellate system.[3] *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003).

To fairly present a claim, it is not enough that all the facts necessary to support a federal claim were before the state court or that a somewhat similar state law claim was made. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Harris v. Rees*, 794 F.2d 1168, 1174 (6th Cir. 1986); *see also Duncan*, 513 U.S. at 366 (mere similarity of claims is insufficient to exhaust). "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan*, 513 U.S. at 365-66. Although the most obvious way to alert the state court of a constitutional claim is to cite to the Constitution itself, the petitioner need not do so. Instead, as the Sixth Circuit has noted, there are four actions a petitioner may take which are significant to the determination whether a claim has been "fairly presented": "(a) reliance on federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis, (c) assertion of the claim in terms so particular as to call to mind a specific constitutional right, and (d) allegation of a pattern of facts well within the mainstream of

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

constitutional litigation." *McMeans v. Brigano*, 228 F.3d 674, 680-81 (6th Cir. 2000); *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) (quoting *Daye v. Attorney General*, 696 F.2d 186, 193-94 (2d Cir.1982)); *accord Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995).

When a petitioner fails to properly exhaust a claim, that claim is considered procedurally defaulted. Procedural default may occur in two different ways. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."[4] *Id.* Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Id.* (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732, the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806. As will be explained more fully below, because the petitioner presented to the state court his claims that the trial court improperly admitted the photograph of the victim taken while she

[4] In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit set forth four factors to consider in determining whether a claim is barred on habeas corpus review because a petitioner failed to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and can demonstrate that he was actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (*citing Maupin*, 785 F.2d at 138).

was alive, that the trial court improperly admitted testimony about the petitioner's prior threatening conduct, and that the trial court erred in sentencing him  solely as errors under state law, and because there are no further state-court remedies available to the petitioner, these claims are procedurally defaulted.

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as a result of the alleged federal violation or can show actual innocence.  *Coleman*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999); Rust, 17 F.3d at 160-61.  To show cause sufficient to excuse a failure to raise claims on direct appeal, the petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Factors that may establish cause include interference by officials, attorney error rising to the level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available.  *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010).  A claim may be sufficiently novel to excuse a default if, at the time of the default, the basis for the legal claim was not yet in existence.  *See id.*at 837-38.  A petitioner's *pro se* status and ignorance of his rights do not constitute cause.  *See Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995).

### 1.  Photograph of the Victim While Alive

The petitioner argues that the trial court violated his right to fair trial under the Fifth and Fourteenth Amendments when it admitted a photograph of the victim taken while she was alive. The respondent contends that this claim is procedurally defaulted.

At trial, the petitioner's counsel objected to the admission of the photograph, arguing that the photograph was irrelevant and its purpose was primarily to stir the sympathy of the jury. (ECF No. 14-9 at Page ID# 611-12.)  The trial court overruled the objection and the photograph was admitted during the testimony of the victim's sister, Samantha Singer.  (*Id.* at 612-13.)  The trial court concluded that the photograph was admissible so long as the state established that the photograph accurately depicted the victim the last time Ms. Singer had seen her.  (*Id.*) Additionally, the trial court concluded that the photograph "was relevant to establish that this is how [the victim] looked when  . . . she was alive and breathing . . .."  (*Id.* at Page ID# 613.) After the trial court ruled that the photograph was admissible, Ms. Singer testified that the picture "fairly and accurately" represented the way the victim looked the last time Ms. Singer saw her.  (*Id.* at Page ID# 613-14.)

On appeal to the TCCA, the petitioner argued that, under *state* law and *state* rules of evidence, (*see* ECF No. 14-8 at Page ID## 1468-70), the trial court erred when it admitted the photograph of the victim taken while she was alive.  The TCCA, relying exclusively on state law and state rules of evidence, concluded that the trial court did not err in admitting the photograph of the victim because it was relevant at trial and because:

> [i]n *State v. Nesbitt*, 978 S.W.2d 872, 902 (Tenn. 1998) (appendix), our supreme court approved of the use during trial of a photograph taken while the victim was alive to establish the corpus delicti of the crime and to prove that the "'person killed was the same person named in the indictment.'

*Sydnor I*, 2010 WL 366670, at *15. As such, the claim the petitioner seeks to raise in this court, that the admission of the picture of the victim taken while she was alive violated his *federal* constitutional rights, was not fairly presented to the state court. Because the petitioner did not fairly present this claim to the state court, and because the petitioner has no further state court remedies available, this claim is procedurally defaulted. *See Duncan*, 513 U.S. at 365 (holding that [i]f a habeas petitioner wishes to claim that an evidentiary ruling in a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.")

The petitioner has not attempted to explain his failure to raise in the state court the claim he raises in this court. Accordingly, because the petitioner's claim is procedurally defaulted, and the petitioner has not established cause to excuse the default, his application for habeas review of this claim must be denied.

### 2. Testimony Regarding the Petitioner's Prior Threatening Conduct

The petitioner argues that the trial court violated his right to a fair trial under the Fifth and Fourteenth Amendments when it admitted the testimony of Savannah Singer and Hilary Selvin regarding three recorded telephone messages the petitioner had left for the victim and her youngest son. Additionally, the petitioner argues that the trial court violated his constitutional rights by admitting Ms. Selvin's testimony regarding an apparent argument that she witnessed between the victim and the petitioner who were seated in a car in her driveway. The respondent contends that this clam must be denied because it is procedurally defaulted.

The TCCA considered this issue in connection with the petitioner's direct appeal:

> Prior to trial, the appellant filed a "Motion to Exclude Prior Bad Acts" pursuant to Rule 404(b) of the Tennessee Rules of Evidence. Specifically, the appellant challenged the testimony of Singer and Selvin regarding the threatening messages

the appellant left on the victim's voice mail. At the pretrial hearing on the motion and at trial, Selvin testified that in February 2005, she saw the victim and the appellant sitting in the victim's car which was parked in Selvin's driveway and that she saw an argument between the victim and the appellant. Selvin said that after the argument, the victim took the appellant to the bus station. She returned, crying and distressed, and shortly thereafter left for a week-long visit to Montana.

Singer and Selvin said that in February 2005, after the victim's return to California from Montana, they heard the threatening messages the appellant left on the victim's voice mail for the victim and her youngest son. Singer testified that because of the threatening messages, the victim left California and went to stay with her sisters in Tennessee.

At the conclusion of the hearing, the trial court found the testimony was admissible. At trial, Singer and Selvin testified in accordance with their motion hearing testimony. After each witness testified, the trial court instructed the jury that the prior acts testimony was to be considered "only on the issue of [the appellant's] intent and motive to commit the offenses for which he is on trial . . . [and not] to show that [the appellant] had a propensity to act in conformity with his conduct on the occasions that he left the voice mails."

Specifically, on appeal, the appellant contends that the testimony should have been excluded pursuant to Tennessee Rule of Evidence 404(b) because identity was not a material issue in the case and that the contested testimony "does not establish the [appellant's] motive, since neither incident offers any insight or explanation as to why the [appellant] would wish to kill the victim." The appellant contends that the contested testimony did not establish intent but instead demonstrated his propensity to commit the crime. Additionally, the appellant contends that the danger of unfair prejudice outweighed the probative value of the testimony.

A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn.1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." *State v. Luellen*, 867 S.W.2d 736, 740 (Tenn.Crim.App.1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. In the instant case, the State argued that both prior incidents related to the lack of accident.

[T]he prior acts testimony of Singer and Selvin reflected that after an argument, the victim left the appellant and went to Montana. When she returned to California, the appellant left threatening messages on her voice mail, indicating he knew she was back in town. In response to the messages, the victim left California for Tennessee. The proof at trial reflected that the victim's death occurred shortly before she was scheduled to go to Pennsylvania for an event to which the appellant was not invited.

Unquestionably, a trial court may admit evidence of prior acts by an accused against a victim to show intent and motive. Indeed, this court has previously stated, "The relations existing between the victim and the defendant prior to the commission of the crime are relevant." *State v. Glebock*, 616 S.W.2d 897, 905–06 (Tenn.Crim.App.1981). In this case, "[t]hese relations indicate hostility toward the victim and a settled purpose to harm or injure [the victim]." *Id*. Moreover, . . . prior acts evidence is appropriate to rebut a claim of mistake or accident if such a claim is asserted as a defense. *State v. McCary*, 922 S.W.2d 511, 514 (Tenn.1996).

The appellant maintains that he "did not assert accident or mistake as a defense, so there was nothing to rebut on this issue." We disagree. In cross-examining Officer Spain, defense counsel repeatedly asked if the appellant asserted that he killed the victim by accident. Further, during closing argument, defense counsel argued that the victim's death occurred because the appellant "took it too far" and that "something . . . went out of control" and "got out of hand." In other words, the appellant's defense was that he did not intend to cause the victim's death; it was just the result of an unfortunate series of events. Therefore, contrary to the appellant's assertion on appeal, his theory of defense raised the issue of accident and lack of intent. As the appellant's claims of accident and lack of intent were the crux of the case, the probative value of the evidence was great and was not outweighed by any unfair prejudice. From our review of the record, we conclude the trial court did not err in allowing the State to adduce proof, namely the voice mails, to rebut the appellant's claims of accident and that his actions were unintentional.

Regarding the incident in Selvin's driveway, the trial court stated that "the situation is relevant to give the context of the relationship that was existing between these two people and her frustration with not being able to get away from him." Additionally, the trial court gave the following curative instruction after Selvin's testimony:

> I instruct you that you cannot consider this evidence to establish premeditation or intent as it relates to the first degree murder charge for which [the appellant] is now on trial. You can only consider this testimony to place in context the nature of the parties' relationship at the

time of the incident at Ms. Selvin's home and to explain the subsequent actions of [the victim].

In *State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn.2000), our supreme court stated that

> when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Turning to the instant case, we conclude that the incident in Selvin's driveway was relevant to the issues at trial. The major issue in this case was whether the appellant intentionally or accidentally killed the victim. The driveway incident demonstrated their tumultuous relationship. Moreover, the absence of evidence about the driveway incident would have created a chronological or conceptual void in the State's case regarding the timeline of and the reason for the victim's move to Tennessee.

*Sydnor I*, 2010 WL 366670, at *16–18. As with the previous claim, the petitioner raised the issues regarding Ms. Singer's and Ms. Selvin's testimony under state law and state rules of evidence. (*See* ECF No. 14-18 at Page ID# 1471-76.) Likewise, the TCCA resolved this claim relying exclusively on state law. Consequently, no state court has passed on whether the admission of this testimony violated the petitioner's federal constitutional rights. What is more, the petitioner has no state remedies available to exhaust this claim. As a result, the petitioner's federal claim is procedurally defaulted and he fails to allege any facts to demonstrate cause for the default. Accordingly, the petitioner is not entitled to habeas relief on this claim.

### 3. Sentence

The petitioner argues that his federal constitutional rights were violated when the trial court sentenced him to the maximum sentence allowed for range-one, second-degree murder.

Specifically, the petitioner argues that the state court violated the holding in *Blakeley v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007) by sentencing the petitioner to the maximum sentence based on facts the trial court, and not the jury, found to be true. The respondent argues that this claim is procedurally defaulted as it was not presented to the state court as a federal constitutional claim.

The petitioner raised on direct appeal a claim in which he contended "that the trial court erred in imposing the maximum sentence of twenty-five years for his conviction of second degree murder," because the petitioner's sentence was inconsistent with provisions of the Tennessee Sentencing Act. *Sydnor I*, 2010 WL 366670, at * 20. The TCCA considered this claim as follows:

> Appellate review of the length, range or manner of service of a sentence is de novo. *See* Tenn.Code Ann. § 40–35–401(d) (2006). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* Tenn.Code Ann. §§ 40–35–102, –103, –210 (2006); *see also State v. Ashby*, 823 S.W.2d 166, 168 (Tenn.1991). The burden is on the appellant to demonstrate the impropriety of his sentence. *See* Tenn.Code Ann. § 40–35–401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. *Id.* at (d); *Ashby*, 823 S.W.2d at 169.
>
> In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114.

Tenn.Code Ann. § 40–35–210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* Tenn.Code Ann. § 40–35–114 (2006); *State v. Carter*, 254 S.W.3d 335, 343–44 (Tenn.2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence . . . [and are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections –102 and –103 of the Sentencing Act." *Id*. at 345–46.

At the sentencing hearing, the victim's sisters testified that the victim was afraid of the appellant throughout their relationship and that she called him "the devil." The victim told Singer that the appellant had disclosed to her that he had previously murdered someone, and the victim feared that he would kill her. Singer said that the victim tried to evade the appellant by moving to Tennessee, but the appellant's mother bought him a one-way bus ticket to Tennessee and he followed the victim. Singer said the victim had been a fun-loving, vibrant person.

The appellant's mother, Bernadine Lewis, testified that the appellant's family was "tight-knit" and that the appellant had been a good student and athlete. She said that she and the appellant's father were divorced and that the appellant had lived with both of them from time to time because he did not have a residence of his own. She said that the appellant had worked numerous jobs "in food service" and for a Chrysler dealership in Nashville. Lewis stated that as an adult, the appellant became involved with drugs. She said that he attempted drug rehabilitation at least twice, but his attempts were unsuccessful. Lewis recalled that the appellant had previously enlisted in the Navy but that he was sent home after six weeks for failing a drug test. Lewis stated that the appellant needed drug treatment; however, she questioned his ability to complete treatment.

Lewis maintained that the instant offenses were "way out of [the appellant's] character," but she acknowledged that the appellant had previously stolen from his father's family. Lewis said that the appellant had a four-year-old daughter

who lived with her mother in Australia. Lewis acknowledged that the appellant did not pay child support.

Michelle Sydnor, the appellant's sister, testified that the appellant was not a violent person. She said that the appellant had given money to his daughter and that she paid monthly child support for him. She stated although the appellant worked several jobs in the restaurant industry before he began "pretty heavily using drugs" in 2003, he did not have a steady work history thereafter. She said that after the appellant began using drugs, he stole from different stores, including the store where the victim worked. She said that the appellant had two uncles who had been "hooked" on drugs, one of whom was killed trying to buy drugs.

At the conclusion of the sentencing hearing, the trial court noted that the appellant had been found guilty of a Class A felony. *See* Tenn.Code Ann. § 39–13–210(c). The trial court found that the appellant was a standard, Range I offender. *See* Tenn.Code Ann. § 40–35–105(a) and (b). The court then imposed the maximum sentence of twenty-five years. *See* Tenn.Code Ann. § 40–35–112(a)(1) (providing that a Range I offender guilty of a Class A felony is subject to a sentence of not less than fifteen years nor more than twenty-five years).

On appeal, the appellant contends that his sentence for second degree murder is excessive. Specifically, he argues that the trial court erred in finding that he treated the victim with exceptional cruelty. Tennessee Code Annotated section 40–35–114(5) provides that a trial court may consider whether a "defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense" in enhancing a defendant's sentence. The appellant acknowledges that this enhancement factor is typically applied when a victim is tortured, but he maintains that the evidence did not establish that the appellant tortured the victim.

The court placed the "greatest weight" on the appellant treating the victim with exceptional cruelty. *See* Tenn.Code Ann. § 40–35–114(5). The court said that "common sense tells the Court that this occurred over a period of time and it started with the hog-tying of her because it was through the hog-tying of her that he more readily and easily was able to stuff the sock down her throat." The court noted that although the medical examiner could not definitively determine how long it would have taken the victim to asphyxiate, the proof adduced at trial indicated that it had taken longer than a few seconds. The court said that the appellant did not have to hog-tie the victim to accomplish the murder. Further, the court observed that the sock in her throat and the cord around her neck did not "prevent her totally from breathing, but slowly resulted in her inability to breathe sufficiently." The court said that proof at trial suggested that there was a "lack of significant blood around the neck area . . . because it was in all likelihood she was probably close to death." Therefore, the trial court found that the appellant's behavior went well-beyond what was necessary to cause the murder.

In *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn.2001), our supreme court concluded that the exceptional cruelty factor is applicable in cases of "extensive physical abuse or torture." In the instant case, the appellant tightly hog-tied the victim, stuffed a sock down her throat, sliced her throat several times, and tightly wrapped a shirt and an electrical cord around her neck. *See State v. Alvarado*, 961 S.W.2d 136, 151 (Tenn.Crim.App.1996); *State v. Johnson*, 970 S.W.2d 500, 507 (Tenn.Crim.App.1996). The trial court found that the circumstances of the offense indicate that the murder occurred slowly over a period of time while the victim was immobilized and terrorized. We conclude that the trial court properly considered this enhancement factor.

Further, we note that the trial court also found that the appellant used a deadly weapon in the commission of the murder. *See* Tenn.Code Ann. § 40–35–114(9). The court said that the sock stuffed down the victim's throat and the electrical cord which was tied tightly around the victim's neck were deadly weapons in that they were "capable of causing death or serious bodily injury." *See* Tenn.Code Ann. § 39–11–106(a)(5)(B) (providing that a "deadly weapon" is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury.") This court has previously concluded that "[o]bjects other than traditional weapons may, depending on their use, be deadly." *State v. Eaves*, 959 S.W.2d 601, 604 (Tenn.Crim.App.1997). In fact, "[a] pillow, a sock, telephone wire, a hairbrush, and a long-handled flashlight have all been held to constitute deadly weapons because of the manner in which they were used." *Id.*; *see also State v. Haynes*, 720 S.W.2d 76, 81 (Tenn.Crim.App.1986); *State v. Thomas Vincent Jackson*, No. 03C01–9201–CR–34, 1993 WL 87831, at *2 (Tenn.Crim.App. at Knoxville, Mar. 26, 1993). Regardless, the court noted that the appellant also used a knife during the commission of the offense. The court observed that the victim was five feet and one-half inches tall and weighed about a hundred pounds while the appellant was over six feet tall and weighed about 240 pounds. The court stated that the large size discrepancy between the appellant and the victim "made the instruments even more likely to cause death or serious bodily injury." The proof justifies the application of this enhancement factor.

The appellant also contends that because the trial court stated that the appellant should have been convicted of first degree murder, the court's imposition of the maximum sentence was arbitrary. Further, the appellant maintains that the trial court was unwilling to consider any mitigation offered by the appellant. The appellant contends that the trial court should have considered that he "has strong family support, has a high school education and attended college, has no history of criminal convictions, was employed at the time of his arrest, and was remorseful for the victim's death." *See* Tenn.Code Ann. § 40–35–113(13).

Regarding the appellant's criminal history, the trial court found that although the appellant had no prior criminal convictions, he nevertheless had a long history of drug use. The court also noted that the appellant repeatedly stole to support his drug habit and refused to pursue rehabilitative efforts. The court found that the appellant's continued drug usage was criminal conduct worthy of significant weight as an enhancement factor. *See* Tenn.Code Ann. § 40–35–114(1). We conclude that the trial court properly refused to apply the appellant's lack of criminal convictions in mitigation.

The court gave some weight in mitigation to the appellant's assistance to police in finding the victim's body and her car. *See* Tenn.Code Ann. § 40–35–113(9). However, the court also noted that the appellant gave police differing versions of events, essentially blaming the victim for her own demise. Therefore, his assistance to police was entitled to only minimal weight.

The court noted that the appellant had a poor work history, stating that the evidence demonstrated the appellant "worked off and on some in various restaurant jobs and a few thing[s] like that, but I think I counted maybe 28 months over his adult life or 38 months." Additionally, the court found that the appellant's relationship with drugs was stronger than his relationship with his family. We conclude that the trial court did not err in failing to mitigate the appellant's sentence based upon his work history and strong family connections.

Finally, the trial court rejected the appellant's contention that he was remorseful for the victim's death. The court said:

> I forgot which one of the family members testified, but she . . . was testifying about his glare in his eyes and this type of thing and I concur with them 100 percent. I have yet to see anything other than a cold hard stare on [the appellant's] face since he first entered this courtroom some year and a half ago. I found it most interesting he hasn't seen his loving mother or loving sister since November or October of 2005, and they walk into this courtroom today and both of them get on the stand and show true remorse and crying and everything else and [the appellant] didn't flinch. He looked at them with the same look he looks at everybody else and that is cold, emotionless. The words that he put on some paper that his attorney probably assisted him in preparing is meaningless to the Court and is an insult to the family. [The appellant] has no more remorse for these events than a hungry dog does when he steals a bone off a plate. I did notice one time today, because I kept looking at him during the trial just to see if I could . . . see any emotional reaction when his own family testified, and there was none. . . . I don't know if this man has any feelings other than for himself. . . . [I]f he does, he's never shown it in this courtroom and I don't know how many times he's been in this courtroom, 20, 25 times, I have yet to see a look on his

> face different than he's been showing here today, the same he showed
> during the course of the trial. And then, to make it worse, going back to
> the fact that he several occasions implicated her as the perpetrator of this
> whole event, because of her attempted suicide. . . . If that's his definition
> of remorseful, then he is much scarier than a lot of people recognize.

> The court opined that the appellant's lack of honesty, his failure to accept
> responsibility, and his lack of remorse reflected poorly on his rehabilitative
> potential. Based upon the foregoing, the trial court imposed a sentence of twenty-
> five years for the second degree murder conviction. Our review of the record
> leads us to conclude that the evidence supports the sentence imposed by the trial
> court.

*Sydnor I*, 2010 WL 366670, at *20–25. Plainly, the petitioner argued that the trial court erred

under state law, and only state law, when it sentenced him, and the TCCA, relying exclusively on

state law, determined that no error had occurred. The petitioner never argued that his sentence

was unconstitutional, that it violated any holding of the United States Supreme Court or that his

sentence was improperly based on facts found by the judge and not the jury. Therefore, the

petitioner failed to fairly present to the state court the claim he raises in his federal habeas

petition. The petitioner has no additional state-court remedies available to raise this claim. As a

result, this claim is procedurally defaulted. The petitioner does not suggest, let alone establish,

any cause for his failure to fairly present to the state court the claim he raises here.

Consequently, the petitioner is not entitled to habeas relief on this claim.[5]

---

[5] Even if the petitioner were to suggest that, when he filed his appeal his *Blakely* claim was "so
novel that its legal basis [was] not reasonably available . . .," he could not establish cause.
*Cvijetinovic*, 617 F.3d at 837. The Sixth Circuit has found that, because "[t]he instruments
necessary for the construction of such a claim were furnished in *Apprendi* [*v. New Jersey*, 530
US 466 (2000)]," which was decided more than eight years before the petitioner filed his initial
appeal, "after *Apprendi*, defense counsel were armed with the weapon they needed to attack the
constitutionality of sentencing enhancements imposed on the basis of judge-found facts."
*Cvijetinovic*, 617 F.3d at 838; *see also* ECF No. 14-18 (showing that the petitioner's brief on
appeal was filed on May 22, 2008.) Moreover, the perceived futility of raising such a claim also
cannot establish cause because "futility cannot constitute cause if it means simply that a claim
was 'unacceptable to [a] particular court at [a] particular time.'" *Cvijetinovic*, 617 F.3d at 838
(citing *Bousley v. United States*, 523 U.S. 614, 623 (1998).

**B.      Motion to Suppress**

The petitioner asserts that the trial court violated his Fifth and Fourteenth Amendment rights when it denied his motion to suppress all but the initial portion of the statements he made to Officer Fairbanks, because all further statements were made in the course of a custodial interrogation before he received his *Miranda* warnings.  The petitioner contends that, apart from his initial statements to Officer Fairbanks that he had participated in cutting the victim's throat and giving Officer Fairbanks information about where the victim could be found, all other statements he gave to law enforcement officers were made in the course of a custodial interrogation without the benefit of *Miranda* warnings.  The respondent contends that the petitioner was not in custody until he was handcuffed and placed in Officer Fairbanks' patrol car and that his statements up to that point were admissible.

On direct appeal, the TCCA considered this claim as follows:

> In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996).  Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*.  Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo.  *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001).  Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.  Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn.1998).

### 1.  Statements

> Prior to trial, the appellant filed a motion to suppress "all but the initial portion of the statements [he] made to officers."  At the suppression hearing, Officer Fairbanks testified that at around 9:30 p.m. on November 22, 2005, the appellant approached him from South Seventh Street with his hands raised in surrender.

Officer Fairbanks summoned backup officers to the scene and got out of his police car. The appellant told Officer Fairbanks that he wanted to turn himself in. The appellant was emotional and nervous. Officer Fairbanks asked the appellant if he had done something to warrant turning himself in, and the appellant replied that "he took it too far." After Officer Fairbanks asked the appellant what he had done, the appellant said that he and his girlfriend, the victim, had argued and she began "playing like" she would commit suicide. She grabbed a kitchen knife, put it to her throat, and told the appellant that she wanted him to "do it." He put his hand on the knife, and the two of them cut her throat. Officer Fairbanks asked the appellant if he thought the victim was dead, and the appellant said yes. Officer Fairbanks asked the appellant for the victim's name, telephone number, and address. Upon receiving the information, Officer Fairbanks called dispatch and requested that officers in that area investigate the appellant's claims.

Officer Fairbanks said that Officer Spain came to the scene. Officer Spain asked the appellant how he got to that location. The appellant told the officer that after he cut the victim's throat, he took her car and drove around, tossing the knife out on the freeway. He said he parked the car in a nearby alley and threw the keys in the alley.

Officer Fairbanks stated that Detectives Matthew Filter and Terrance Bradley also responded as backup. Officer Fairbanks said that the appellant was not handcuffed at the time the detectives arrived. After they arrived, the appellant told Officer Fairbanks that he wanted to sit down. Officer Fairbanks told the appellant that he could sit in the patrol car but that he would have to be handcuffed first. Officer Fairbanks then handcuffed the appellant and put him in the back of the patrol car. The detectives told Officer Fairbanks that he should not ask any questions of the appellant after he was handcuffed, and Officer Fairbanks complied with the detectives' instruction. Officer Fairbanks maintained that he never told the appellant that he was under arrest or made him think he had been charged prior to handcuffing him. Officer Fairbanks said:

> I went ahead and put him in cuffs based on the seriousness of what he had told me he had done and I didn't know if he had committed a crime at that point or not, he was telling me that he did, so I just made the decision to go ahead and have him detained until we could figure out, especially since the crime he was confessing to was homicide.

Officer Fairbanks said that prior to being handcuffed, the appellant offered several times to show the officers where the victim's car was parked. Officer Fairbanks maintained that after the appellant was handcuffed, the appellant gave him directions to the victim's car but that the directions were not given in response to questioning. Specifically, Officer Fairbanks stated:

> After I placed him in handcuffs and put him in my police car, [the detectives] told me don't ask him anything else.
>
> ....
>
> I don't remember exactly how we began talking about the car. He had told us several times he would show us where it was, and at some point, you know, when I started to drive or go, he was telling me where to go to find the car, so I just followed his direction.

Officer Fairbanks acknowledged that neither he nor any of the officers at the scene advised the appellant of his *Miranda* rights.

Detective Matthew Filter testified that on November 22, 2005, he and Detective Bradley responded to Officer Fairbanks' request to respond to South Seventh Street and Sylvan. Officer Fairbanks asked for assistance because the appellant said he had killed his girlfriend. Detective Filter said that when they arrived at the scene, the appellant and Officer Fairbanks were standing outside Officer Fairbanks' car. Officer Fairbanks related the information he had received from the appellant and said he had called for police to investigate the appellant's claims and check on the welfare of the victim. While Detective Filter was speaking with Officer Fairbanks, the appellant "made several comments, just voluntary statements about what had transpired over about the last day and a half." The appellant said that he and the victim had argued and that when they argued she would act like she would commit suicide. On this occasion, she had taken a knife and put it to her throat, acting like she would cut her throat. The appellant told Detective Filter that when he attempted to take the knife away, "they cut her throat" and that he believed she was dead. Afterward, he took the victim's car and threw away the knife while driving on the freeway. Detective Filter said that the appellant was "rather anxious" and "very cooperative."

The following colloquy occurred regarding when the appellant was handcuffed:

> [State:] And at that point when he was saying those things to you and you came to the scene, was he in cuffs at that point?
>
> [Detective Filter:] I don't recall if he was or not.
>
> [State:] Do you—do you recall him being placed in cuffs?
>
> [Detective Filter:] He was placed in cuffs. At one point, shortly before we left that intersection, he was placed in cuffs by Officer Fairbanks and placed in the back seat of Officer Fairbanks' car.

Detective Filter said that he advised Officer Fairbanks not to question the appellant any further after handcuffing him and that no one asked the appellant any questions after he was handcuffed.

Detective Filter stated that prior to being handcuffed, the appellant mentioned that he had abandoned the victim's car in an alley. However, he did not direct the officers to the alley where he had abandoned the victim's car until after he was handcuffed. Detective Filter explained, "[I]f my report says that he was handcuffed when I arrived, then he was handcuffed when I arrived." However, he maintained that "[t]oday as I sit here, I remember, I believe Officer Fairbanks put him in handcuffs after I arrived on the scene." Detective Filter said that he did not recall asking the appellant any questions; the appellant volunteered information. Detective Filter said that the detectives were at the scene when Officer Archie Spain arrived.

Officer Archie Spain testified that on November 22, 2005, he heard Officer Fairbanks inform dispatch that he was speaking with someone in a known high crime area. Officer Spain was in the area, so he went to assist Officer Fairbanks. Officer Spain said that when he arrived, the appellant "was standing there unhandcuffed just crying like a baby." The appellant told him that he thought he had killed his girlfriend. The appellant said that after he cut the victim's throat, he took her car and threw the knife out on the interstate. One of the officers asked the appellant when the incident happened and the appellant responded that it happened two or three days earlier and that he parked her car in a nearby alley. Officer Spain recalled that "around this time, I don't know exactly when, Officer Fairbanks pulled the handcuffs out of his wallet or pistol belt and advised that he was going to handcuff the [appellant] for his safety and Officer Fairbank[s'] safety. The [appellant] was nice and cooperative."

Officer Spain stated that no questions were asked of the appellant after he was handcuffed because Officer Fairbanks put him in the patrol car at that point. Officer Spain said that there was no "aggressiv[e] interrogat[ion]" of the appellant. He said that the appellant "was crying and saying that he had to get this off of his chest so he was volunteering it."

After the appellant was placed in the patrol car, Officer Spain got into his car and followed Officer Fairbanks to the nearby alley where the victim's car was located. Officer Spain said that Detectives Filter and Bradley did not arrive while he was there. He believed that the detectives arrived as he was leaving the alley.

The trial court found that during the "first set of statements," given before the appellant was handcuffed and placed in the police car, the appellant was not in custody. The court found that during the "second set," there was no questioning involved; the appellant heard Officer Fairbanks tell the detectives what the appellant had said and then the appellant "interjected himself into that

conversation." The court stated that Officer Fairbanks essentially testified that he did not ask the appellant any questions except "preliminary investigative matters that . . . definitely aren't covered under *Miranda*."

On appeal, the appellant contends that "all but the initial portions of the statements he made to officers occurred while he was subjected to custodial interrogation without benefit of the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." He maintains that "the trial court erred in ruling that all statements he made prior to being handcuffed were admissible. . . . [A]part from his initial statements to Officer Fairbanks that he participated in cutting his girlfriend and giving the address where she was found, his statements were the product of custodial interrogation without benefit of *Miranda* warnings. . . ." Specifically, the appellant argues:

> [T]he proof at the suppression hearing and at trial established that the [appellant] approached Officer Fairbanks with his hands raised as if he were surrendering to police. Officer Fairbanks immediately asked enough questions to ascertain that according to the [appellant], the victim's throat had been cut, and that she was at a specific address given to him by the [appellant]. Upon receiving this information, Officer Fairbanks clearly would not have allowed the [appellant] to walk away. The [appellant] submits that at that point, he was 'in custody' for purposes of *Miranda*, and should have been advised of his *Miranda* rights before any further questions were asked. Subsequent statements made by the [appellant] in response to police questioning that he thought his girlfriend was dead, that he disposed of the knife on the freeway, and statements that directed police to the location of the car, should not have been admitted. The proof is undisputed that the [appellant] had not been advised of his *Miranda* rights when these statements were made.

The State contends that "the court properly found the [appellant] was not in custody or under arrest when he voluntarily approached the police and told them that he had murdered his girlfriend."

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. *See State v. Callahan*, 979 S.W.2d 577, 581 (Tenn.1998). As our supreme court has explained:

> In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

*State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn.2000). The entitlement to *Miranda* protections is limited to situations involving custodial interrogation or its functional equivalent. *Walton*, 41 S.W.3d at 82. A trial judge's findings of fact at a motion to suppress hearing are accorded the weight of a jury verdict. *See State v. Tate*, 615 S.W.2d 161, 162 (Tenn.Crim.App.1981). Accordingly, the trial court's findings of fact are binding upon this court if the decision is supported by a preponderance of the evidence. *Odom*, 928 S.W.2d at 22–23.

In determining whether a suspect is in custody for *Miranda* purposes, we must consider "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn.1996). The analysis is very fact-specific. *Id.* Certain factors are relevant to our inquiry, including but not limited to the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id*. We note that whether a suspect is in custody is determined by an objective test. *State v. Bush*, 942 S.W.2d 489, 499 (Tenn.1997).

The record before us reflects that the appellant flagged down Officer Fairbanks, walked toward the officer's patrol car with his hands raised in surrender, and said he wanted to turn himself in because he had taken a situation "too far" and thought he had killed his girlfriend. Officer Fairbanks testified that the interaction was cordial and conversational. The two men stood beside the police car during the conversation, and, until the point when the appellant was handcuffed and placed in the police car, the appellant was unrestrained. Officer Fairbanks never told the appellant that he could not leave, and the appellant exhibited no desire to do so. Officer Fairbanks asked questions of the appellant to discern what he was talking about, noting that he initially believed the appellant had mental issues.

> For most of the contested conversation, the only people present were the appellant and Officer Fairbanks. Later, they were joined by Officer Spain. The trial court found that the appellant was not in custody when he spoke with Officer Fairbanks and Officer Spain prior to the detectives' arrival. However, the trial court found that by the time the detectives arrived, the appellant was in handcuffs and should have been Mirandized before further interrogation. The court stated that any statements the appellant made in the police vehicle, directing officers to the victim's car, were inadmissible because the statements were made in response to conversations with Officer Fairbanks. Regardless, the trial court found that the appellant had earlier described the location of the victim's car and that, therefore, Officers Fairbanks and Spain had a "good idea where it was."

*Sydnor I*, 2010 WL 366670, at *7–13. Relying on the broader protections provided by the Tennessee Constitution and considering the totality of the circumstances surrounding the petitioner's interrogation, the TCCA denied the petitioner's motion to suppress, concluding that "the evidence does not preponderate against the trial court's ruling," and affirmed the trial court's finding that the petitioner's statements to Officers Fairbanks and Spain were admissible. *Id.* at * 11.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, in order to protect a suspect's Fifth Amendment privilege against self-incrimination, when a suspect is in custody, law enforcement officials must warn the suspect, before his interrogation begins, of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). The test for determining whether an individual is "in custody" for purposes of *Miranda* is objective: whether a reasonable person in the defendant's position, knowing the facts as the defendant knew them, would have felt that he was under arrest or was "otherwise deprived of his freedom in any significant way." *Miranda*, 384 at 477. The determination does not turn on the subjective views of either the

interrogating officer or the person being questioned. *Stansbury*, 511 U.S. at 323; *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003).

The Sixth Circuit has identified several factors to be considered when determining whether an interrogation was custodial: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he did not need to answer questions. *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *United States v. Panek*, 552 F.3d 462, 465 (6th Cir. 2009)).

With these four factors in mind, the court finds that there is no evidence to support the petitioner's claim that the statements he made prior to being handcuffed were made in the course of a custodial interrogation. During the time that the petitioner made statements regarding the victim's death, where he disposed of the knife he claimed he and the victim used to cut the victim's throat, and what he had done with the victim's car, the petitioner spoke with Officer Fairbanks while standing in the road after having flagged Officer Fairbanks down, approached Officer Fairbanks while he stood by his patrol vehicle and told Officer Fairbanks he wanted to turn himself in. (*See* ECF No. 14-4 at 320-23.) Officer Fairbanks testified that, while he was talking to the petitioner, they were "basically having a conversation" and that they stood at "normal conversation distance" as they spoke outside of his patrol car. (*Id.* at Page ID## 324, 333.) There is no evidence to suggest that the conversation outside Office Fairbanks patrol car was prolonged. Rather, Officer Fairbanks testified that it was less than five minutes between the time the petitioner flagged him down and the time the Detectives arrived, and only "a matter of minutes" from the time the Detectives arrived to the time the petitioner was handcuffed." (*Id.* at Page ID# 325.) When the petitioner stated that he wanted to sit down, Officer Fairbanks

35

explained that the petitioner could sit in his patrol car but would have to be handcuffed in order to do so, and when the petitioner agreed, all questioning stopped.  (*See id.*at Page ID# 321.) Plainly, the petitioner himself chose the location of the discussion that followed when he spotted Officer Fairbanks' patrol car and approached it.  Moreover, the evidence suggests that the discussion was more in the manner of a conversation than an interrogation, and it did not last very long before the petitioner was handcuffed and placed in Officer Fairbanks' patrol car, at which point all questioning stopped.

There is no evidence that the petitioner was restrained, up until the point he was handcuffed and placed in Officer Fairbank's patrol car.  Indeed, Officer Fairbanks testified that he was so surprised by the petitioner's confession — "because people don't usually walk up to me and tell me something like this at any given time" — that he called the Mobile Crisis Unit, thinking that the petitioner might have mental health issues, rather than that he had actually committed a crime.  (*Id.* at Page ID## 321, 331.)  Moreover, while the petitioner was not told that he did not have to answer any questions, the testimony, and the petitioner's actions, suggests that the petitioner was distraught about what he had done and that he needed to tell someone about what had happened.  (*See e.g Id.* at Page ID# 354 (Detective Filter's testimony that, when he arrived on scene and walked over to where the petitioner and Officer Fairbanks were standing, the petitioner "made several comments, just voluntary statements about what had transpired over about the last day and a half"); *id.* at Page ID# 357 (Detective Filter's testimony that when he arrived on-scene, the petitioner "was acting rather anxious.  He was very talkative and seemed like he had a lot on his mind that he wanted to tell us" and that the petitioner was "very cooperative"); *Id.* at Page ID# 362 (Detective Filter's testimony that the petitioner "approached me and started telling me I guess his version or his side of the story")).  In other words, the

petitioner's desire to relieve his conscience seems to have motivated most, if not all, of the conversation that the petitioner, on his own, had instigated. (*See e.g., Id.* at Page ID# 320 (Officer Fairbanks' testimony that the petitioner approached him saying he wanted to turn himself in and that the petitioner was "real distraught" and started saying that "he thought he . . . took it too far"); *Id.* at Page ID# 416 (Officer Spain's testimony that he was standing there unhandcuffed just crying like a baby"); *Id.* at Page ID# 343 (Office Fairbanks' testimony that he "could tell that [the petitioner] wanted to tell me something").)[6] Clearly, the petitioner was not restrained when he initiated the conversation with Officer Fairbanks, and testimony established that the petitioner appeared to want to talk to the law enforcement officers to get something off of his chest. Moreover, immediately after it was determined that the petitioner would be handcuffed, all questioning stopped.

Based on the foregoing, the state court's conclusion that the petitioner's statements were not made in the course of a custodial interrogation was not objectively unreasonable, nor did it result in a decision that was contrary to clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). The petitioner, therefore, is not entitled to relief on this claim.

---

[6] At an earlier hearing on the suppression of the petitioner's statements, Officer Fairbanks testified that the petitioner was "very distraught." (ECF No. 14-2 at Page ID# 274.) "He was kind of emotional and – – it was like he was scared and nervous and at the same time he was wanting to get something off of his chest that he had done." (*Id.* at Page ID## 274-75.) Officer Fairbanks also testified that it appeared that the petitioner was "worried about what he had done and he needed to tell somebody, you know, about it" and that Officer Fairbanks had "[t]he feeling . . . that [the petitioner] could not live with it anymore, he needed us to know what had happened, and he wanted to, you know, turn himself in because he knew he was wrong." *Id.* at Page ID ## 278-79.

### C.     Post-Mortem Photographs

The petitioner argues that the trial court erred when it admitted three post-mortem photographs of the victim and that the admission of such evidence violated his Fifth and Fourteenth Amendment rights.  The respondent argues that this claim is meritless.

To the extent that the petitioner claims that the trial court erred in admitting the three post-mortem photographs, his claim is not cognizable in these federal habeas proceedings.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if the petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if

the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

The three photographs at issue were introduced through the testimony of Amy McMaster, M.D., the Deputy Chief Medical Examiner for Davidson County. As to Exhibit 25(C), Dr. McMaster testified that the photograph,

> shows [the victim's] right hand once the belt has been removed, showing the round rust-colored areas that correspond with the metal rivets on the belt.

(ECF No. 14-10 at Page ID# 798.) Dr. McMaster further testified that the photograph

> tells me a couple of things; one the circular rust stain areas confirm that that's where the rivets were on the belt. It also tells me that there's a very pale area on her hand . . . and on her thumb, the area of the skin is much redder and darker, and so it tells me that the belt was tight around her wrists because it's tight it pushed the blood on either side of that ligature or belt, that tells me that it was tight around her wrists.

(*Id.* at Page ID# 798.) As to the photograph marked as Exhibit 26, Dr. McMaster testified that the photograph depicted the victim's "lower face, neck and upper chest area" which showed that there were multiple cuts to the victim's neck. (*Id.* at Page ID# 800.) Dr. McMaster explained that the cuts to the victim's neck were not immediately life-threatening and that they were relatively superficial. (*Id.* at Page ID# 801.) Additionally, the photograph established that the items wrapped around the victim's neck were wrapped tightly and, because they were so tight, "they push[ed] the blood out of that area." (*Id.*at Page ID# 802.)

Finally, Dr. McMaster testified that the photograph marked as Exhibit 27 depicted, "a portion of [the victim's] face with the gag still in place, the white sock in her mouth, . . . a portion of the black electrical cable, and also the pink shirt around her neck." (*Id.* at Page ID# 803.) She explained that this photograph was significant because it showed "marks on [the victim's] chin [that were] abrasions or scratches, and [where they were] located in the area where

she had the pink shirt wrapped around her neck, so in my opinion, those abrasions are related to the materials that was around her neck." (*Id.* at Page ID # 802.)

Upon reviewing the record, the TCCA found that "[t]he photographs clearly belie the appellant's version of events" and demonstrated "a lack of accident." *Sydnor I*, 2010 WL 366670, at *16. Moreover, the TCCA found that "[t]he photographs are not overly gruesome" and their probative value was not outweighed by any prejudicial effect. *Id.* The TCCA thus concluded "that the trial court did not err in finding the photographs admissible." *Id.*

The testimony at trial revealed that the petitioner told law enforcement officers that he and the victim, together, cut the victim's throat in the course of the victim's effort to commit suicide, (s*ee* ECF No. 14-9 at Page ID## 631, 667), and that he "took it too far" and had killed the victim accidentally (*id.* at Page ID## 644, 657). After telling his story about what happened, the petitioner revealed that he thought the victim was dead. (*Id.* at Page ID# 637.) Thus, the testimony at trial suggested that the victim died by accident in the course of trying to commit suicide and, while the petitioner participated, he did not act alone. However, the testimony of the law enforcement officers who responded to the victim's apartment, not to mention the photographic evidence, including the photographs described above, told a very different story.

James Fuqua, a Detective who responded to the victim's apartment testified that the victim was found in the bedroom:

> laying on a blanket on her stomach, her hands had been bound behind her back, her ankles had also been bound, and then a belt had secured each, and then there was a cord that had been pulled in behind and tied her hands and feet together in what we commonly call a hog tie position. She had a shirt wrapped around her face, and I could see what appeared to be a cord off a telephone charger that was protruding out from underneath that shirt. She was obviously deceased or I felt sure she was deceased, although I didn't get down and check vital signs. There was some small amount of blood on the carpet.

(*Id.* at Page ID# 687-88.)

Kenneth O'Neal, one of the first police officers to arrive at the victim's apartment testified that:

> Initially, when I walked in the bedroom, I didn't notice her at first on the floor, I was still clearing the apartment, I was scanning the room with a flashlight at about waist level. I did, in my peripheral, notice there was something in the center of the floor, I proceeded to move around to clear the closet that was open in the corner of the room. Once I notice there was no one inside the closet, I turned to see what it was I had walked around, that's when I noticed her, she was, of course laying face down, hands and feet bound to each other in a hog tie fashion. She's blonde-headed, I couldn't exactly tell if it was a male -- a female white or female black. Her hair seemed to be hanging down over her face. Her hands of course were a light color, but, you know, without blood flow in the hands it possibly wouldn't matter if you were white or black, they would probably turn white either way.

(*Id.* at Page ID## 731-32.)

Finally, Dr. McMaster testified in depth about the state of the victim's body when the victim was brought to the coroner's office, (*see* ECF No. 14-10 at Page ID## 793-95), and opined that, "[b]ased on the internal and external findings, the cause of the victim's death was "asphyxia," "a lack of oxygen" and the manner of death was "homicide." (*Id.* at Page ID# 805.)

As the TCCA found, the post-mortem photographs of the victim were relevant to belie any suggestion that the victim's death was accidental and to contradict the petitioner's statements that, in the course of the victim attempting to commit suicide, he and the victim, together, cut her throat. (*See e.g.*, ECF No. 14-4 at Page ID# 320, ECF No. 14-9 at Page ID# 632, 667-68.) Additionally, as the TCCA accurately noted, the photographs, while disturbing in their depiction of the cruelty inflicted upon the victim, "are not overly gruesome." (*Id.*; *see also* ECF No. 14-14 at Page ID# 1134, 1141-42)

Significantly, the Sixth Circuit and other circuit courts have found no due process violation in far more extreme cases involving photographs of murder victims. *See, e.g. Biros v.*

41

*Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (holding that admission of photographs depicting murder victim's severed head, her severed head held near her torso and severed breast, and her torso with her severed head and severed breast replaced on torso, did not deprive defendant of fair trial, and thus did not warrant federal habeas relief); *see also Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996) (photos relevant to prove that defendant knowingly restrained the victim); *Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (no due process violation where petitioner challenged the admission of six photographs "depicting the charred remains of the victims' bodies"; despite the fact that the petitioner did not dispute the manner of death, "the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events"); *Willingham v. Mullin*, 296 F.3d 917, 928–29 (10th Cir. 2002) (denying claim that the admission of 22 photos of the murder victim's body was so unduly prejudicial as to render his trial fundamentally unfair, where photos relevant to issue of intent). The petitioner has not demonstrated that admission of these three post-mortem photographs amounted to a due process violation.  Moreover, the state court decision denying relief was not objectively unreasonable.

> **D.  Sufficiency of the Evidence**

The petitioner claims that the evidence adduced at trial was insufficient to support his conviction for theft of property valued at more than $1,000 but less than $10,000.  Specifically, he argues that the state failed to establish the value of the victim's automobile.  Respondent argues that this claim is meritless.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the . . . [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). (en banc) (quoting Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Relying on the standard set forth in *Jackson*, the TCCA considered this claim as follows:

> On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). The appellant must establish that no reasonable trier of fact could have found the

essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Tenn. R.App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn.1990).

A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn.Code Ann. § 39–14–103 (2003). A theft is "[a] Class D felony if the value of the property or services obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)." Tenn.Code Ann. § 39–14–105(6) (2003).

In the instant case, Savannah Singer testified that the victim bought a new, silver, four-door, Honda Accord for her birthday in April 2004. Hillary Selvin testified that the victim lived with her and Bonnie Anderson when she bought the car. Selvin said that the victim "was paying over $500 a month" for the car. The appellant told police that after he cut the victim's throat, he took her car and drove around for a day or two before parking the car and throwing away the keys. The jury, as the trier of fact, found the appellant guilty of theft of property valued at $1,000 or more but less than $10,000. In denying the appellant's motion for new trial, the trial court noted that "I think the jury is allowed to use their common sense in terms of establishing a value and certainly there is nothing that flies in the face of logic that they found the car having the value of $1,000 when it was less than a year old and purchased brand new." *See State v. Jeremy Grooms*, No. 03C01–9409–CR–00321, 1995 WL 238606, at *2 (Tenn.Crim.App. at Knoxville, Apr. 25, 1995). We agree.

*Sydnor I*, 2010 WL 366670, at *19–20.

There was sufficient evidence from which the jury could find that the victim's car had a value of more than $1,000. As the TCCA noted, the testimony at trial established that the victim's car was purchased new in 2004 and that she was paying over $500 per month for the car, which was less than a year old at the time the victim was murdered. (*See id*.) The state

44

court's decision was objectively reasonable and petitioner is not entitled to relief on his insufficiency of the evidence claim.

## VI    CONCLUSION

For the foregoing reasons, the habeas corpus petition will be denied and this matter dismissed with prejudice.

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, Rules Gov'g § 2254 Cases.  The petitioner may not take an appeal unless a district court judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).)

In this case, the issues raised in the petition do not merit further review.  Thus, the court will deny a COA.  The petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals.  Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.


_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE